Good morning, your honors. May it please the court, Christy Hughes from Federal Defenders, on behalf of Ms. Lugo, I'm going to attempt to reserve two minutes for rebuttal. This case came down to two competing theories of what had happened. Ms. Lugo's theory was that she didn't know the drugs were in the car, and that she had been set up by her boyfriend when they took the car to the mechanic. The government's version was that Ms. Lugo was knowingly smuggling drugs. The jury had to decide which of those two versions it credited, and the prosecutor during his closing argument repeatedly improperly tried to affect the jury's deliberation process. Were you, Ms. Hughes, the counsel at the trial court level? I was not, your honor. In reviewing the record, was there an objection raised at all? No, we're on plain error for all four of these errors, which, again, I mean, I understand there's no objection, but I still think that we meet the plain error standard. These errors all, I think, working together affected the jury's ability to fairly weigh the evidence and prejudice Ms. Lugo. The first two errors, diluting the standard of proof and vouching that the circumstantial evidence was overwhelming, went directly to the jury's role. It's the province of the jury to determine the weight of the evidence, and so when the prosecutor is telling the jury that the evidence is overwhelming, that encourages the jury to take his word for it instead of making their own determination. And I think the prejudice there is that the evidence actually wasn't overwhelming. The district court itself noted that the evidence was thin at the close of the government's case. The prosecutor wideared the jury on whether or not they would be okay with a purely circumstantial case. And so when the prosecutor, and again, Ms. Lugo had a plausible defense about her boyfriend setting her up. She testified about how she was naive and inexperienced. There was nothing unusual about the car that would have tipped her off that there were drugs inside. It took experienced and trained agents getting the car up on a lift and basically dismantling it to even discover the drugs. So she had a plausible defense, and when the prosecutor tells the jury that the evidence is overwhelming, he really puts a finger on the scales in a way that's unnecessary. If the evidence is overwhelming, the jury can reach that conclusion on its own. But what's improper about, I'm looking specifically at page 411 of the closing rebuttal, where he talked about the fact that the defense did put on evidence. The government presented evidence, and I'm starting at line 15. The defense doesn't have to present evidence, but if they do present evidence, then you put that into the pot and look at it all together. So you take into consideration when you are thinking about the government's burden of proof, not just the evidence that we presented, which is overwhelming if you think about it and use your common sense, but if you add the extra testimony from the defense witnesses, including the defendant, and I think about the areas I mentioned before, the manner in which she testified, what she said, was it contradicted by other evidence, was it believable? You put that all into the mix, and ladies and gentlemen, the only true verdict is guilty. Why isn't that proper argument based on the evidence that the jury heard from both sides? And it does refer to the government's burden of proof. Well, I think there's a number of problems with that section that Your Honor just read. The one part is the saying that it's overwhelming, which this court said in Ruiz a prosecutor may not do. What if he said, I submit to you, ladies and gentlemen, if you consider all of this evidence, you should conclude that it is overwhelming. Isn't that a proper argument? Perhaps, but again... Are we quibbling about where in that sentence the word overwhelming is placed? I don't think so. I think wherever you place it, it's still the prosecutor's opinion of how strong he thinks his case is, and when it's combined with the fact that he diluted the standard of proof, he said a number of... That specifically refers to the burden of proof, which the district court, of course, instructed the jury on in its jury instruction. Well, he refers to the fact that the government has the burden of proof, and very early on in his closing, he refers to the beyond a reasonable doubt standard. And then he abandons that. He never even mentions the words beyond a reasonable doubt again. And initially, when he mentions beyond a reasonable doubt, he downplays it. He says there's no magic to that standard. He basically doesn't want the jury to think it's too high. He says all you have to do is ask yourself, what is more reasonable for you to believe? He talks about the two competing versions and says, what's more reasonable? And that's the theme of his closing, is what's reasonable. He says repeatedly... But don't we allow jurors to apply their common sense in their evaluation of the evidence? We do. What the pattern instruction says is that you should use your common sense to judge whether or not your doubts are reasonable. For example, one of the issues, as I understand it at trial, was the significance of the fact that she hid from her parents the existence of the boyfriend and her apparently numerous trips to Mexico. So why is it improper to suggest that in trying to assess her credibility, and in that passage I read he specifically references credibility, that the jury should apply its common sense in weighing that evidence against what she told her parents about what she was or was not doing? Well, two responses, Your Honor. First, that's the only instance where he references the testimony and determining whether or not it's reasonable. The other three instances are he tells the jury to determine only what made sense, he tells the jury to reach a verdict that makes reasonable sense, and he tells the jury to ask themselves which theory of the case was more reasonable. And so, Your Honor, I think hit on it, when the jury is asking itself, well, you know, Ms. Lugo was hiding her boyfriend from her parents and her explanation for her trips to Mexico. We're not sure that we really understand them. I think the jury came down to we're not really sure what happened. They deliberated half a day. The evidence itself only took a day and a half. So I think they were trying to figure out what happened. And when the government tells them, just ask yourself what's more reasonable, they may have had some questions about Ms. Lugo's version of events and may have found the government's version more plausible. And if that's the case, they would have convicted, and that is well below the standard of beyond a reasonable doubt. That doesn't mean that they're firmly convinced of guilt. That means they think to themselves. Well, counsel, what troubles me the most about the closing arguments and particularly the rebuttal in this case is the prosecutor's use of the text crossing history. And as I review the record, there isn't any indication that she had smuggled drugs on any other prior occasions, and yet there were repeated references to the fact that this wasn't the first time that she did that. Can you address those arguments? Sure, Your Honor. Your Honor is correct. There was absolutely no evidence about those prior crossings. The fact of the crossing came in. The prosecutor had a chart with the text crossings, but we don't know who drove the car into Mexico. We don't know if she had a passenger with her. We don't know if she was sent to secondary and possibly cleared. The prosecutor never introduced any of that evidence, so we know nothing about those prior crossings other than that they occurred. So when the prosecutor, and I think there were two errors from those prior crossings. One is the 404B propensity argument, and the other is telling the jury that she'd gotten lucky on those prior occasions, and I think they sort of weave together. But the evidence was used for something else, was it not, as well? Wasn't it used to show that it was implausible if the car was so important to her family that it allowed her mother to avoid having to take four buses in order to get to school where the mother was going to college, and the mother said the car was there the whole time, but the tech records show that the car was actually in Mexico for sometimes up to a week or more, and that that was in essence impeaching as to both your client's testimony and the mother's testimony about the car. I don't disagree with Your Honor that the text crossings would have been relevant to impeach Ms. Lugo's testimony on how important the car was, but that's not how the prosecutor only used them in closing argument. He used them then to draw this propensity argument and tell the jury that her thing was to run drugs across the border, that she had this pattern and habit of drug smuggling, and then on the day of the offense she was simply acting as she had previously. So you'd agree it was admissible for impeachment purposes, but not to ask the jury to infer that all the other crossings also must have involved smuggling drugs. Correct, Your Honor. And I think that error, and that she'd gotten lucky before, really gave the jury persuasive, though very improper, reasons to convict, and so when the prosecutor initially was making the overwhelming argument and the reasonable argument and lowering the standard they had to meet and then giving the jury persuasive arguments about her knowledge that were wholly improper because they didn't go to her guilt on this occasion, it tainted the verdict and it affected the jury's ability to fairly weigh the evidence. I'll reserve the remainder of my time. Well, on the burden of proof, just at the start, it's stated, and there's no magic about proof beyond a reasonable doubt, as the judge has indicated, the government is not required to prove to you beyond an absolute certainty. Well, there's no proof beyond absolute certainty. And so that's misleading. At the bottom of that paragraph. Proof beyond a reasonable doubt has been defined by some as near certainty. And it's a very high standard. Can I refer you to... Oh, go ahead. Oh, can I refer you to the sentence that follows what Judge Pregerson just read to you? I'm looking at ER 378. He goes on to say, does the evidence that you have seen in this case indicate beyond a reasonable doubt that she did in fact know that there were drugs in this car when she came into the port of entry on September 12 of last year? There's nothing improper about that statement, is there? Not on its own, but I think you need to read it in conjunction with the prior sentence, where that's where he says there's no magic about proof beyond a reasonable doubt. And the sentence immediately preceding that one is, what you have to do is think to yourself, does it make sense? And then he says, does it indicate beyond a reasonable doubt? And when they're read together like that, it appears to me at least that he's defining indicating beyond a reasonable doubt as ask yourself what makes sense. He's essentially giving them a definition of how to judge this beyond a reasonable doubt standard as what you have to do is think to yourself, does it make sense? And I assume the district court gave the usual instruction about the arguments of the lawyers are not evidence and that you must apply the law as I give it to you. He talked about how what they say is not evidence. Your memory controls the evidence. He did. But here I think one of the real problems and why the district court's instruction shouldn't cure this is because the prosecutor's formulation was so close to the actual correct standard that it was misleading and confusing. He kept telling them, what makes reasonable sense? Ask yourself what's reasonable. And when the correct standard is beyond a reasonable doubt, there's a high likelihood that the prosecutor's misstatement led the jury to believe that that's what the beyond a reasonable doubt concept meant. Even in the face of the court's definition to the jury of what reasonable doubt means and what the burden of proof was on the government? I think so, Your Honor. This was the theme of the government's closing. And as this court has recognized, he's the representative of the United States. He has inherent credibility. And when he's telling them this is the standard repeatedly throughout his closing, I don't think the one statement by the district court outweighs it. Thank you. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Your Honor, there was no prosecutorial misconduct in this case and certainly not that which rises to the level of being so plain or obvious that a competent district judge should have been able to tell without benefit of an objection because that is the plain error standard. Well, one of the arguments that the government raised in its brief is that there was no prosecutorial error with regard to the use of the crossing history because the government is just arguing fair inferences, right? Correct. And the way that the government argued the crossing history was completely different than the argument in the motion eliminated to the court to let in these tech records. Are you saying that she was lucky on those other occasions when she drove the car into the U.S. because they too were loaded with drugs, that there's some evidence of that in the record such that you can draw that inference? And let me just read some of the excerpts that particularly trouble me, and this is just only a part of the closing argument. I'm looking at 183 of the excerpts of record. This smuggling operation was something that she wanted to do because this was her thing to run drugs across the border. And then on to 185, he's talking about all of the times that the record showed that she crossed, all of the times marked in red. And the reason she's not, I'm starting at line 20, the reason she's not sweating bullets is she knows she has a load in there, she knows it's well hidden, and she knows because she's probably done it before. They didn't catch her then, and they're not going to catch her now. Moving on to the next page, line 17, she was hanging out with the wrong crowd, the wrong crowd with drug traffickers, and she was having the time of her life. Whenever they needed somebody to bring a load across, she was down for it. That's why she was coming down and walking back across and coming down and walking back across, but then her luck ran out and she knew exactly what she was doing. You're saying that there's evidence introduced in the record that caused those arguments to be fair inferences? We are, Your Honor, and from that, a couple of things. First of all, by the time this argument comes into being, you've got a full offense by the government and a full defense from the defendant. She's testified, she's asked the jury to believe a story that she needed this car to take her mom to work, to take her sisters to school. On the other hand, you have this evidence, this text evidence, which is admissible for a 404-P purpose, is to prove knowledge, and also a common scheme. This is highly irregular. Are you familiar with the term burning the plates that some agents have testified to in these drug smuggling cases? Burning the plates? Burning the plates that some folks create a crossing history, which the agents refer to as burning the plates, so that supposedly reduces the level of scrutiny that they encounter. So they burn the plates by conducting multiple crossings so that when they do carry a load in, that incident would be subjected to a lesser level of scrutiny, as I understand it from what I've reviewed from other cases. Are you familiar with that term? Maybe not the term, but the concept. Yes, I've heard that concept come up in other cases. So the text crossing history in this case could be because she was trying to burn the plates. So if the AUSA had put in some expert testimony as to burning the plates, I think he could have argued that inference. But arguing that the only explanation for the prior crossing is that she was carrying drugs on other occasions, that's just made out of whole cloth. I don't think he ever said the only explanation, Your Honor. I mean, the defense put their theory to the jury. What he's saying is, look at this. Well, I stand corrected. He said that she must have been carrying loads of drugs on other occasions. And where in the record is there evidence of that? The drugs themselves, there's not direct evidence, Your Honor. There was never any secret that this case was going to be about circumstantial evidence. When she takes the stand and testifies and presents this story, a very detailed story about how this car was so important, when her own mother testifies that that car was never missing from out in front of the house, under cases we cite, I believe, for the general concept, United States v. Kenny, when a defendant testifies, they run the risk, if they're found facially implausible, that the jury can infer the opposite. So the harder she tries, she doth protest too much, the harder she tries to explain the story that becomes more and more implausible, you can infer knowledge. And on top of that... Absolutely you can infer knowledge, that she knew the drugs were there on this particular occasion. But what testimony did the AUSA introduce in the record that shows she was involved in drug smuggling on prior occasions versus, say, she was trying to burn the plates? He didn't use those exact terms, Your Honor, but what he's trying to argue is to say, look, ladies and gentlemen, the defense has put one story in front of you. When we show you this records crossing history, which is unbelievably bizarre, I mean, here you have a woman, it's her very first car, she's driving into, the plates show her leaving Mexico, I'm sorry, entering Mexico with the car, walking back into the United States the next day, and then the car comes back to the United States a few days later, all of this is in the six weeks immediately preceding this event. She wants the jury to believe that she's got this halcyon existence at home, and guess what, it doesn't seem to make sense at all. On the other hand, it is more consistent with somebody who's run drugs, plus the nature of the compartment itself. This wasn't something where she had, let's say, an open bed, what do they call it, an open cab pickup truck, and somebody could just throw drugs in between bales of hay. This compartment took 16 to 20 hours to construct, that was the expert witness. It was unbelievably well hidden, as my opponent pointed out. From that, a reasonable juror could infer, guess what, this isn't just a one-time use of the car. I mean, it's meant to be used on multiple occasions, and then when you couple that with the crossing history, you couple that with... Now, I think the evidence in this case would have supported a clean conviction and have the AUSA not tried to pile on by saying that she's a drug smuggler, she'd done it before, all of those other occasions, she was carrying drugs, this was her thing to hang out with drug traffickers, she was having the time of her life. Had he not done that, you would have gotten a clean conviction. I mean, that's entirely possible, Your Honor. My job would have been made a lot easier, but at the time these cases are argued, we don't know that. As the prosecutor pointed out... But you do know that we scrutinize your arguments carefully. I do. You do that, don't you, Ben? I do. So I think that when you say, which is overwhelming, look, in that... When you're thinking about the government's proven proof, not just the evidence that we presented, which is overwhelming if you think about it and use your common sense, but if you add the extra testimony of the defense witness, including the defendant, think about the areas I mentioned, the manner in which he testified, was it contradicted by evidence? It goes on. And was it believable? I mean, those are fine. But it's not which is overwhelming. You know, the evidence. We proved our case beyond a reasonable doubt. That's the standard, isn't it? It is, Your Honor. So why don't you just stick to that? No, no, what is overwhelming? That's the opinion of the prosecutor. It wasn't phrased in those terms with all due respect, Your Honor. I read it here, which is overwhelming. He said, not just the evidence that we presented, which is overwhelming. He's telling them, our evidence is overwhelming. That's what he's telling them. And that's not what we heard earlier in this where the judge says something about, this is a close case. Well, a couple things. First of all, Your Honor. Isn't that what he said? Yeah, he said that before he heard the defense case. So that was just based on the government's evidence. If somebody decides to take the stand and tell a story, and it's a horrible story, what might have been thin suddenly isn't thin anymore. I don't know. I read it. I didn't think it was a horrible story. I mean, I think she... I mean, that she was dating a boy for nine months, not two houses down or two cities over, but two hours away in a foreign country for nine months, and the parents never knew about that? Yeah, but you know, you've got a young lady here who's gone through a lot of hell in her life, and you've got this guy down there who sounds to me as if he's a real con artist. He was using her. Even though he's a deported alien, and he has no right to come into the country, and yet he somehow set her up with this load of drugs. I mean, that's an argument for them to make to the jury. They did, Your Honor. But what I'm saying is, I mean, when you talk about two uses of the word overwhelming in 27 pages of testimony, my opponent cites the case United States v. Ruiz. In Ruiz, the prosecutor used the word overwhelming five times. This court, not me, this court said, guess what? Three of them were proper. So in and of itself, a passing use of the word overwhelming is not necessarily error. Well, it all depends on the context, who reads it, what reaction you have when you read it. Fair enough, but on that thing, Your Honor, we're here on plain error review. I understand that. I understand. Right, and so to the extent any argument by my opponent ends in, well, they might have thought this, they might have thought this, the Supreme Court, in the case of Donnelly v. De Cristoforo, which we cite, says courts should not be... The first thing you shouldn't do is assume a statement in the heat of argument has its worst possible meaning, and that a jury sitting through a lengthy exhortation... Forget all these cases from San Diego. Tell me why. Why are they from San Diego? Well, you know, we go to trial a lot. After, I believe, Manhattan, we're the second busiest district. No, I think part of it has got to do with the way you try your cases. Well, I mean, that may be... And it's got, because of the way things have been set up in the past 30 years,  that they have some reason to believe that there are really great lawyers down in their office. They do. You know that. I do. They're going to fight you every inch of the way. And yet they never objected to a single one of these things, Your Honor. They didn't even ask during the Rule 30 jury instruction conference for a standard instruction on other acts. I mean, I've practiced in 15 years in this district. They clearly didn't think there was something bad about that evidence. And, you know, my opponent talks about... It's a lot of cross-misconduct argument error type of cases coming out of their offices. Correct. And they know that. They sense blood in the water. Do you usually send the AUSA who tried the case to argue the appeal? Not always. I mean, sometimes it shifts. You know, it's different conventional wisdom. Because last November, I believe I was sitting on a panel. I think Judge Gregersen, you and I were sitting together, and I can't remember who else was on the panel, but it's a trial involving, if I recall correctly, a sentencing issue involving the AUSA who tried this case where the issue of burning the plates came up. So it would be nice to have him to say, well, you knew that agents normally talk about the text record having significance in terms of burning the plates versus being a drug trafficker on prior occasions. And so why would you argue that? It would be nice to have an answer directly from him as to what he was thinking on that issue. I mean, I apologize about that, Your Honor, but to your point about how there are these claims, I mean, our opponents know that. They're going to want to throw anything to the wall and see what sticks. I mean, this first claim of error, I want you to ask my opponent when she gets up. She left out from the excerpts of record the transcript of the defense counsel's closing argument. We have it in ours. From supplemental excerpt of record, page 397 to 404, trial counsel for federal defenders, not once, not twice, not three times, five times, argues that various inferences don't make sense and another time exhorts the jury to use your common sense. This is part of the standard definition of reasonable doubt. Judge Pregerson, you sat on a case that we cited, United States v. Vandering, which says that it is a common practice for one side to challenge the other to explain to the jury uncomfortable facts and inferences, and yet she brings a claim to this tribunal that my colleague's use of the exact same language is somehow improper. That's not fair. What case was that? United States v. Vandering. It's 50 F. 3rd at pages 701 to 02. 50 F. 3rd. Now, how long ago was that? You know, I think it's in the 90s, maybe the late 90s. Yeah, I remember that clearly. But, you know, my point's just being, I mean, what's good for the goose is good for the goose. Believe me when I tell you I believe it clearly. I do. I wouldn't take him on. Maybe. Maybe I should have been a prosecutor. I guess. I'd get away with anything. All I want to leave this tribunal with is that, you know what, they didn't challenge, there's no challenge to the admission of the evidence. They have chosen to frame this issue as prosecutorial. Why can't you people get along down there? I think we get along, Your Honor. Why does all this seem to be going on? I don't know. I mean, you know, when you asked me that same question when I was here in November, and then I had lunch with my opponent the next day, I mean, I don't know, maybe it appears that way, but people enjoy the practice of law, and we have very spirited practice. Well, isn't it true that 5% of all of the border crossings in the United States come across the San Ysidro port of entry? That sounds correct, Your Honor, but I honestly don't have... They're seizing 5 to 15 loads a day at the border. That's what I was told when I toured the border. I mean, this is a huge problem now. I'm not surprised that you see a lot of drug smuggling cases out of San Ysidro and Otay Mesa. You've got a lot of people coming through there every day. And, you know, I know my colleagues in the trial units, they're busy. I tell you, I think it's, you know, at least in L.A., you know, the district judges have a nice variety of cases. I mean, I sat down in San Diego in the trial court there to help out, and it was in 1968, and they were still having... They had to put in separate bungalows and this and that. I just wondered, you know, this is the kind of judging life you want. Listen to this day in and day out, day in and day out. There's probably several of them. I think we have very humane judges because they've had to go through that, you know, hundreds if not thousands of cases. I'm sure, counsel, you're very familiar with the saying that prosecutors can strike hard blows but not foul ones, and so when so many of these cases come up here and there's quite a few reversals on misconduct and argument error, I think the office needs to take a hard look at the practices and the training and figure out why that's the case. And they are, Your Honor, and I know, you know, we've represented that before. All I would hope to say in response is out of, you know, fairness, when you have a case like this where it's only framed as misconduct, there was never any objection below it. My opponent earlier, I think, in response to a question from Judge Tallman, said, oh, so you agree it was admissible for impeachment only, the text, but not other purpose. She says, yes, they never asked for any limitation of the admission of the testimony below. If this were a case where the district court said, guess what, you can bring in evidence A, B, and C, but you can only use it to argue X, Y, and Z, and then my colleague argued something completely different, then you could say, wow, that's really awful. But here when the evidence comes in without any limitation, when the defense doesn't even ask for other acts instruction, and I believe Judge Tallman pointed out, too, of course the jury was given the usual instruction that the statements of counsel are not evidence. If you count from the record, Mr. Jones, the prosecutor, he said that himself at least three times during the argument, and Judge Lorenz said that, too. He said, you know, we're just the lawyers, what we're telling you isn't the evidence, and the judge said that. And I guess the last point I'd bring up is because this is on plain error review, even if you find errors, we'd say it wasn't prejudicial, and I would draw your attention to a case called United States v. Whitehead, 200F30, page 639. On plain error review in another border bus drug importation case from the Southern District of California where the defendant was the driver and sole occupant of a vehicle with $35,000 worth of marijuana, this court said that was, quote, independent, comma, overwhelming physical evidence of his guilt. And later on the same page said here the physical evidence was virtually conclusive of guilt. This defendant was the driver, sole occupant, and registered owner of a vehicle in which $150,000 of methamphetamine was found, and it wasn't just stuck up under the chassis with a magnet or thrown in the back with hay or whatever. It was in a very hard-to-find compartment that could not have been accessed without the defendant's knowledge. Well, but this so-called boyfriend, he got the car for her, didn't he? In Mexico, yeah, that was her testimony. So he had to know he's a bad guy. He didn't know what was in there. Well, we're not saying they're both not guilty, Your Honor, but you know what, he was also a deported alien. He had no right to even come into this country to follow her to get the drugs. So when one puts all the evidence together, I mean... But what's that got to do with her? Well, it makes her, I'm just saying, it makes her story that she was a blind mule even that less plausible. We don't know why he was departed, do we? No. You know, and... He got a very harsh sentence, too. I believe it was the minimum, the mandatory minimum. Yeah, for what, 6.6 kilograms of methamphetamine? For $150,000, yeah. Well, you know, we get these large quantities up here. You know why? You know why? Because the people here want it, huh? Yeah, people here want it. And so... Well, I wish there were... How are we ever going to solve this problem, huh? That's the million-dollar question. I don't know. I mean, I'm 43, and I don't know now, but I love what I do, and, you know, we've just got to take these cases one by one, Your Honor. Yeah, but we're taking them one by one or whatever it is, but things are not improving. They're getting worse. Don't you think so? I'm not entirely sure, Your Honor. I mean, I don't have the stats at my disposal, but I can see why Your Honor would feel that way. New drugs are being concocted, and well, they're concocted here too. Yeah, that's true. So... It's... You know, when I was growing up... Like, marijuana was legal as far as I know. That's right. I didn't grow up in the nicest part of town, but I didn't know anybody that smoked marijuana. I didn't know anyone. You know, not... I remember in Spanish we... The teacher who was a French woman, we had to sing La Cucaracha about marijuana, que fumar, you know. About all the Spanish I remember. You know, it was all like everybody thought it was funny. Now that we made it all illegal, everybody wants it. Whiskey was illegal, and those had bootleggers. Now nobody's even buying that stuff. They're all into wines. Good for your health. Right. So it's called the... Hidden fruit. Why a stolen watermelon tastes better than one... That you buy in the store. Anyway... You're just 43 years old? Seems like you've been around for decades. I have. How long have you been coming up here? Since 2000, for 15 years. 15 years. Well, you're a very nice guy. I appreciate that, Your Honor. It's an honor and a pleasure to appear before this court. All right. Thank you. Thank you, Counselor. Thank you. Let's get some rebuttal. Can I just make one quick point? I've got two minutes left. Your Honors, we're asking, why do we keep having misconduct cases out of the Southern District? We have what? Your Honors, we're asking, why do we keep having these misconduct cases out of the Southern District? And I think Mr. Rahe's argument highlights why. He's here arguing to this court that what's good for the goose is good for the gander. He told this court that apparently the defense erred in not filing an eliminate motion asking that the prosecutor not make an improper propensity argument when the text evidence was introduced. When what? He made an argument that we should have asked eliminate for the prosecutor to be limited to only arguing that the text border crossings, to only arguing that they were relevant to the purpose for which they were admitted. We shouldn't be having to file eliminate motions saying, Your Honor, please prevent the prosecutor from making an improper propensity argument. And the fact is, what's good for the goose is not good for the gander. The prosecution is held to a very high standard. As Your Honor noted, they are not at liberty to strike foul blows. And so I think Your Honor should reverse here because although their office has had training, it's clearly not sinking in because they're still here on appeal arguing that there was no misconduct in this case. Thank you, Your Honors. Thank you. Thank you. Okay. All right. Let's take care of the matters that are to be argued and we'll adjourn until a later date.
judges: Pregerson, Tallman, Nguyen